Citation Nr: 1725247 
Decision Date: 06/30/17 Archive Date: 07/10/17

DOCKET NO. 12-05 731 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Paul, Minnesota


THE ISSUES

1. Entitlement to an initial rating for service-connected major depressive disorder and generalized anxiety disorder in excess of 50 percent prior to January 24, 2017, and in excess of 70 percent from January 24, 2017.

2. Entitlement to a rating in excess of 30 percent for service-connected headaches.

3. Entitlement to an effective date prior to October 27, 2010 for a total disability rating based on individual unemployability (TDIU).


REPRESENTATION

Appellant represented by: Jason E. Johns, Attorney


WITNESS AT HEARING ON APPEAL

Appellant
ATTORNEY FOR THE BOARD

M.G. Mazzucchelli, Counsel


INTRODUCTION

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2016). 38 U.S.C.A. § 7107(a)(2) (West 2014).

The Veteran appellant served on active duty in the United States Air Force from March 1952 to April 1956. 

This case originally came before the Board of Veterans' Appeals (Board) on appeal from rating decisions issued by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Paul, Minnesota, in August 2011 and May 2013. 

The case was remanded, in December 2013, so that a requested Board videoconference hearing would be scheduled. Thereafter, the appellant testified at a Board videoconference hearing that was conducted before the undersigned Veterans Law Judge in March 2014. However, there was a malfunction in the recording equipment and a transcript of the proceeding could not be generated. Therefore, in May 2014, the Board asked the appellant whether he wanted another hearing. Later that same month, the appellant's attorney informed the Board that the appellant did not want to appear at another Board hearing and asked that the case be considered on the evidence of record.

In a July 2015 decision, the Board, in pertinent part, denied an initial rating in excess of 50 percent for service-connected anxiety, to include the restoration of the disability rating from August 1, 2013; entitlement to a disability evaluation in excess of 30 percent for the service-connected headaches; and entitlement to an effective date prior to October 27, 2010 for TDIU, to include the restoration of TDIU from August 1, 2013. 

The Veteran appealed the July 2015 Board decision to the United States Court of Appeals for Veterans Claims (Court). A June 2016 Joint Motion for Partial Remand requested that those parts of the July 2015 Board decision that denied an initial rating in excess of 50 percent for service-connected anxiety, to include the restoration of the disability rating from August 1, 2013; entitlement to a disability evaluation in excess of 30 percent for the service-connected headaches; and entitlement to an effective date prior to October 27, 2010 for TDIU, to include the restoration of TDIU from August 1, 2013, be vacated and the matters remanded to the Board. The Court granted the motion.

In a December 2016 decision, the Board remanded the case for further development. Subsequently, in a February 2017 decision, the RO restored the 50 percent rating for the Veteran's service-connected psychiatric disability, now characterized as major depressive disorder and generalized anxiety disorder, from August 1, 2013; granted a 70 percent rating for that disorder from January 24, 2017; denied a rating in excess of 30 percent for service-connected headaches; and restored the TDIU from August 1, 2013. The issues remaining before the Board are as shown on the first page of this document.


FINDINGS OF FACT

1. Prior to January 24, 2017, the Veteran's service-connected psychiatric disability caused occupational and social impairment with reduced reliability and productivity; occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, was not shown.

2. From January 24, 2017, the Veteran's service-connected psychiatric disability caused occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood; total occupational and social impairment has not been shown.

3. Throughout the appeal period, there is no objective evidence that the service-connected headaches involve very frequent completely prostrating and prolonged attacks that produce severe economic inadaptability.

4. In March 2007, the appellant submitted a claim of entitlement to TDIU.

5. A rating decision dated in August 2007 denied the appellant's TDIU claim; the appellant was notified of the denial that same month, but he did not appeal it.

6. In February 2011, the appellant submitted a claim of entitlement to TDIU.

7. A February 2012 rating action granted TDIU, with a combined schedular rating of 70 percent, effective October 27, 2010.


CONCLUSIONS OF LAW

1. The criteria for an initial rating for service connected major depressive disorder and generalized anxiety disorder in excess of 50 percent prior to January 24, 2017, and in excess of 70 percent from January 24, 2017, have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.321(b), 4.130, Diagnostic Codes 9400, 9413, 9434, 9435 (2016).

2. The criteria for a rating in excess of 30 percent for the service-connected posttraumatic headaches have not been met. 38 U.S.C.A. § §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.321(b), 4.124(a), Diagnostic Codes 8045, 8100 (2016).

3. The criteria for the assignment of an effective date earlier than October 27, 2010, for the grant of TDIU have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.340, 3.341, 4.15, 4.16, 4.18, 4.19 (2016).



REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Increased Ratings

The law provides that disability evaluations are determined by the application of a schedule of ratings that is based upon an average impairment of earning capacity. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Separate diagnostic codes identify the various disabilities. Where there is a reasonable doubt as to the degree of disability, such doubt will be resolved in favor of the claimant. 38 C.F.R. §§ 3.102, 4.3, 4.7. In addition, the Board will consider the potential application of the various other provisions of 38 C.F.R., Parts 3 and 4, whether they were raised by the appellant or not, as well as the entire history of the Veteran's disability in reaching its decision, as required by Schafrath v. Derwinski, 1 Vet. App. 589 (1991). 

In the evaluation of service-connected disabilities, the entire recorded history, including medical and industrial history, is considered so that a report of a rating examination, and the evidence as a whole, may yield a current rating which accurately reflects all elements of disability, including the effects on ordinary activity. 38 C.F.R. §§ 4.1, 4.2, 4.10, 4.41. While a veteran's entire history is reviewed when assigning a disability evaluation, 38 C.F.R. § 4.1, where service connection has already been established and an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. Francisco v. Brown, 7 Vet. App. 55 (1994). A decision of the Court has held that in determining the present level of a disability for any increased evaluation claim, the Board must consider the application of staged ratings. See Hart v. Mansfield, 21 Vet. App. 505 (2007). In other words, where the evidence contains factual findings that demonstrate distinct time periods in which the service-connected disability exhibited diverse symptoms meeting the criteria for different ratings during the course of the appeal, the assignment of staged ratings would be necessary. See also Fenderson v. West, 12 Vet. App. 119 (1999).

Where there is a question as to which of two disability evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7.

Ratings are assigned according to the manifestation of particular symptoms. However, the use of the term "such as" in 38 C.F.R. § 4.130 demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). 

Further, in determining the appropriate disability rating, the Board must consider whether the case should be referred for extra-schedular consideration pursuant to 38 38 C.F.R. § 3.321 (b)(1). See Thun v. Peake, 22 Vet. App. 111, 115-16 (2008).

Psychiatric Disability

Secondary service connection was established for anxiety with depression in a rating decision issued in August 2011. An initial 50 percent evaluation was assigned in a rating decision issued in February 2012, effective from October 27, 2010 (date of the grant of service connection). In a May 2013 rating action, the RO reduced the evaluation to zero percent, effective August 1, 2013. A February 2017 rating decision restored the 50 percent rating for the service connected psychiatric disability, now characterized as major depressive disorder and generalized anxiety disorder, from August 1, 2013. It also granted a 70 percent rating from January 24, 2017.

The Veteran contends that he suffers from near-constant depression and is entitled to a disability evaluation in excess of 50 percent for the entire appeal period. As reflected by his attorney's letter of May 2014, the appellant's spouse and daughter testified during his March 2014 Board videoconference hearing that he suffered from nervousness and irritability demonstrated by incidents in which he yelled and snapped at his grandson and his tendency to nervously scratch his arm, often drawing blood.

Under the General Rating Formula for Mental Disorders, a 50 percent rating is assigned for occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships.

A 70 percent rating is assigned for occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships.

A total occupational and social impairment, due to such symptoms as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name, will be rated as 100 percent disabling.

The rating formula is not intended to constitute an exhaustive list, but rather is intended to provide examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). Accordingly, the evidence considered in determining the level of impairment under 38 C.F.R. § 4.130 is not restricted to the symptoms provided in the Diagnostic Code. Instead, VA must consider all symptoms of a veteran's condition that affect the level of occupational and social impairment, and assign an evaluation based on the overall disability picture presented. However, the impairment does need to cause such impairment in most of the areas referenced at any given disability level. Vazquez-Claudio v. Shinseki, 713 F. 3d. 112 (Fed. Cir. 2013).

On a VA psychological examination in April 2011, the Veteran and his wife reported his being irritated more easily, having his mood affected by headaches, not feeling pleasure in doing things, fearing death, having chronic sleep impairment, being anxious, having no interest in things, and feeling fatigued. The Veteran stated that he was not depressed if he did not have a headache. He also said that when there was some relief of the headaches, he experienced some anxiety that they might be retriggered and that he was limiting almost all activities due to prevention of making his headaches worse. The examiner noted that the Veteran had a flattened affect. The Veteran underwent psychological testing which revealed mild to moderate levels of anxiety as well as moderate symptoms of depression. The examiner concluded that the Veteran's symptoms were all due to anxiety and that the symptoms of anxiety and depression were secondary to his physical condition. The examiner rendered a diagnosis of Anxiety Disorder, NOS (not otherwise specified) and assigned a Global Assessment of Functioning (GAF) score of 67. The examiner assessed the Veteran as having occupational and social impairment with reduced reliability and productivity. 

On a VA psychological examination in September 2012, the examiner reviewed the Veteran's VA medical treatment records and stated that there was no medical evidence that the Veteran had ever sought treatment for anxiety. The Veteran was accompanied by his wife at the examination. He reported that his marriage was good and that he had about 20 friends. He played cards or went to the casino occasionally for fun. The Veteran stated that he did not feel depressed or have suicidal thoughts, hallucinations or delusions. He reported that his mood most days was "pretty good" and that he did not have significant anxiety. The examiner defined anxiety for the appellant as anticipation of something bad happening, feeling jittery, nervous, worried, uptight. The Veteran said that he did not feel that way. The Veteran stated that he could not think of any things causing him distress and that his ability to work was not affected by any mental health issues. The examiner described the Veteran's affect as full range. Psychological testing revealed an anxiety scale score of 28; greater than 75 is considered significant. The examiner noted that the Veteran had not reported that his headaches were a cause of any psychiatric sequelae and that neither the Veteran nor his wife had anything additional to report on the topics covered or on anything that was not covered during the examination. The examiner assessed the Veteran as having no diagnosed psychiatric disorder.

As noted in the Joint Motion, the September 2012 examination report is internally inconsistent. The examiner found that the Veteran had "no [diagnosis] on axis I or II[,]" but on the next page of the examination report indicated that he had an Axis I diagnosis. Further, later in the examination report, the examiner indicated that the Veteran had "total occupational and social impairment" in response to the question "[w]hich of the following best summarizes the Veteran's level of occupational and social impairment with regards to all mental diagnoses." For these reasons, the Board does not find the September 2012 examination reliable for judging the severity of the Veteran's psychiatric disability.

During a January 2013 VA medical examination, the Veteran denied experiencing any depression or anxiety during the review of systems portion of the examination. 

A VA neuropsychological evaluation was conducted July 7, 2014. The Veteran "reported no mental health history, and this report was corroborated by his wife. He acknowledged being easily irritated by his grandchildren but reported no history of suicidal or homicidal ideation. He described his mood as otherwise generally good but noted that he occasionally will have flashbacks to the 1956 accident when falling asleep." On examination, the Veteran was groomed and dressed appropriately. He was cooperative for all evaluation procedures. His effort appeared to be good, and multiple embedded measures of symptom validity fell within normative standards. The Veteran had an incorrect understanding of the reason for the evaluation but otherwise had an accurate understanding of his current circumstances. His affect appeared relatively flat, but he was noted to be more engaged during the testing process. The Veteran reported no concerns about depression, and no history of hallucinations or delusions. His thought processes were logical, with content focused on his persistent trouble with headaches and his expectation that he was to have a disability evaluation. His speech was receptive and expressive skills were considered sufficient for testing purposes as characterized, for example, by accurate answers to interview questions, but occasional word-finding difficulty was noted. The examiner noted that the Veteran "endorsed a severe level of depressive symptoms including feelings of helplessness and hopelessness. Although he reported no suicidal ideation, he reported not thinking it is wonderful to be alive now." 

A VA psychiatric examination was conducted January 24, 2017. The examiner stated that the Veteran was now diagnosed with major depressive disorder and generalized anxiety disorder. The Veteran reported that he was depressed and irritable all the time. He experienced continual sadness and hopelessness. While he stated that he thought at times it would be easier if he were not here, he denied suicidal ideation. The examiner described the level of major depression as severe. 

The examiner noted that the Veteran's psychiatric disabilities caused occupational and social impairment with reduced reliability and productivity. The examiner endorsed the following symptoms: depressed mood; anxiety; suspiciousness; near continuous panic or depression affecting the ability to function independently, appropriately, and effectively; chronic sleep impairment; flattened affect; disturbances of motivation and mood; and impaired impulse control such as unprovoked irritability with periods of violence. 

The examiner further stated that while on a self-administered questionnaire the Veteran attained a score which fell in the severe range of depression, that his symptom severity and reported functional assessment were not consistent with the level of symptom severity endorsed by the Veteran. "Symptoms reported by Veteran during interview are consistent with diagnostic criteria for 'mild' major depressive disorder with anxious distress." The examiner stated that "interpersonally he is noted to be able to interact with staff and others on a superficial basis to ask questions and request for assistance."
The Veteran is not entitled to an evaluation in excess of a 50 percent schedular rating at any time prior to January 24, 2017. The evidence of record does not indicate that he suffered from occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking or mood during this period. While the Veteran reported experiencing near-constant depression, the evidence of record shows that the Veteran had, by his own account, maintained his activities of daily living and engaged in such activities as playing cards, driving a motor vehicle, attending church every Sunday, attending sporting events of his grandchildren, going to the casino and going out to restaurants. In addition, he had also regularly appeared for VA treatment without any psychiatric complaints. For example, no anxiety or depression was observed while the Veteran was an inpatient in a VA facility in September 2011, and his depression screens were negative in December 2010, October 2011, and November 2012, when he denied feeling down, depressed or hopeless and he was never prescribed any medication for a psychiatric disorder during that period.

In addition, the Veteran denied experiencing any depression or anxiety during the review of systems portion of the VA examination conducted in January 2013, and an April 2013 internal medicine note reflects that no psychiatric condition was included on the list of the appellant's active problems/computerized problem list. Psychological testing in September 2012, revealed an anxiety scale score of only 28, with a score greater than 75 needed for the anxiety to be considered significant.

While on the VA neuropsychological evaluation in July 2014 the Veteran "endorsed a severe level of depressive symptoms including feelings of helplessness and hopelessness," the examiner also noted in the same report that the Veteran "acknowledged being easily irritated by his grandchildren but reported no history of suicidal or homicidal ideation," "described his mood as otherwise generally good," and "reported no concerns about depression."

Furthermore, the objective findings of the Veteran's VA inpatient and outpatient medical treatment during this portion of the appeal period contain no evidence that he had any psychiatric symptoms. The Veteran had reported irritability and verbally snapping at people, but neither he nor any member of his family ever reported any instance of violence towards others, or any instances toward animals. He had never been considered a danger to himself or others. At all times, the Veteran had been found to be oriented in all tested spheres and capable of expressing himself in a coherent and logical manner, and he retained good communication skills. 

In addition, while the Veteran reported social isolation, he had been able to attend church, sporting events, gamble at a casino and go to restaurants (in June 2012, he thought he might need new dentures because of chewing problems when out at restaurant). He reported having 20 friends. He had also been able to live with his wife and maintain his personal hygiene and other activities of daily living. Therefore an initial evaluation in excess of 50 percent is not warranted under the applicable rating criteria prior to January 24, 2017.

The RO granted a 70 percent rating based on the January 24, 2017 VA examination report that listed manifestations consistent with that level of impairment, specifically near continuous panic or depression affecting the ability to function independently, appropriately, and effectively; and impaired impulse control such as unprovoked irritability with periods of violence. 

There is no probative evidence which tends to show that the Veteran's psychiatric disability is productive of total occupational and social impairment. While the Veteran had apparently not worked for many years due to various serious medical issues, there is no showing that his psychiatric disability by itself resulted in total occupational impairment. The January 2017 VA examiner stated that the Veteran's psychiatric disabilities caused occupational and social impairment with reduced reliability and productivity. His depression and anxiety symptoms were noted to be severe and to interfere with his social and interpersonal relationships; however, he has been shown to have a good relationship with his wife and have a number of friends. Additionally, the Veteran does not experience the gross distortion of reality described in the criteria for a 100 percent rating. The Veteran has consistently been described as oriented, with clear speech and logical thoughts. Thus, a rating in excess of 70 percent is not warranted at any time.

The Board has also considered whether the case should be referred to the Director of the VA Compensation and Pension Service for extraschedular consideration under 38 C.F.R. § 3.321(b) (2016). In determining whether a case should be referred for extra-schedular consideration, the Board must compare the level of severity and the symptomatology of the claimant's disability with the established criteria provided in the rating schedule for disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the disability picture is contemplated by the rating schedule, the assigned evaluation is therefore adequate, and no referral for extra-schedular consideration is required. See Thun v. Peake, 22 Vet. App. 111, 115 (2008). The manifestations of the disability are specifically contemplated by the schedular criteria. 

The Veteran's symptoms are explicitly listed in the rating criteria for psychiatric disorders, or are contemplated by the level of representative impairment as the listed symptoms are merely examples of a level of impairment. See 38 C.F.R. §4.130, Diagnostic Codes 9400, 9434. Therefore, referral for extraschedular consideration in this case is not in order.

Headaches

The Veteran contends that his service-connected post-traumatic headaches are more severe than the current rating reflects. He contends that the frequency and severity of his headaches have forced him to stop working. 

The Veteran's service-connected post-traumatic headaches are evaluated pursuant to Diagnostic Codes 8045 and 9304, pertaining to brain diseases due to trauma and dementia due to head trauma, respectively. Under Diagnostic Code 8045, a 10 percent rating is warranted for purely subjective complaints following trauma, such as headache, dizziness, insomnia, etc., recognized as symptomatic of brain trauma. This 10 percent rating will not be combined with any other rating for a disability due to brain trauma. Ratings in excess of 10 percent for brain disease due to trauma under Diagnostic Code 9304 are not assignable in the absence of a diagnosis of multi-infarct dementia associated with brain trauma. Purely neurological disabilities such as hemiplegia, epileptiform seizures, facial nerve paralysis, etc. resulting from brain trauma are rated under the diagnostic codes specifically dealing with such disabilities. 38 C.F.R. § 4.124a.

Migraine headaches are evaluated pursuant to 38 C.F.R. § 4.124a, Diagnostic Code 8100. Under this Diagnostic Code, a 30 percent disability rating is assigned for migraine headaches with characteristic prostrating attacks occurring on an average of once a month over the last several months. A 50 percent rating is assigned for migraine with very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability; this is the highest rating available under this Diagnostic Code.

The use of the conjunctive "and" in a statutory provision means that all of the conditions listed in the provision must be met. See Melson v. Derwinski, 1 Vet. App. 334 (1991); compare with Johnson v. Brown, 7 Vet. App. 95 (1994) (holding that only one disjunctive "or" requirement must be met in order for an increased rating to be assigned). Here, because of the successive nature of the rating criteria, such that the evaluation for each higher disability rating includes the criteria of each lower disability rating (at least what could be considered most of them), each of the criteria listed in the 50 percent rating must be met in order to warrant such a rating. See Tatum v. Shinseki, 23 Vet. App. 152, 156 (2009).

The rating criteria do not define "prostrating," nor has the Court. Cf. Fenderson v. West, 12 Vet. App. 119 (1999) (in which the Court quotes Diagnostic Code 8100 verbatim but does not specifically address the matter of what is a prostrating attack.). By way of reference, the Board notes that according to WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH, THIRD COLLEGE EDITION (1986), p. 1080, "prostration" is defined as "utter physical exhaustion or helplessness." A very similar definition is found in DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1367 (28th Ed. 1994), in which "prostration" is defined as "extreme exhaustion or powerlessness." 

In addition, the term 'productive of severe economic inadaptability' is not defined by VA regulations. However, the Court has stated that this term is not synonymous with being completely unable to work and that the phrase "productive of" could be read to mean either "producing" or "capable of producing" economic inadaptability. See Pierce v. Principi, 18 Vet. App. 440, 446-47 (2004). 

In a February 2010 memorandum decision, the Court determined that there was no error in the Board's application of the schedular criteria for evaluating posttraumatic headaches such that affirmance of that portion of the September 2008 Board decision was warranted. The Court noted that the Veteran had argued that he had frequent headaches that were completely prostrating in that he sustained daily headaches, some of which required him to retire to a dark, quiet room until they passed. The Court also noted the Veteran's statements that he recently had to cease working for a local farmer, as he had done for 17 years, because the jostling of the farm equipment caused headaches. The Court was unable to conclude that the frequency and severity of the appellant's headaches presented a picture of extreme exhaustion or powerlessness especially since the record reflected that the Veteran denied associated weakness and the Court stated that, while the Veteran must sometimes retreat to a darkened, quiet, room, he does so not because he is physically incapacitated, but because he desires that the headaches pass. The Court found that there was no evidence in the record that the Veteran's headaches disability rose to the level of completely prostrating and therefore affirmed the Board's denial of a 50 percent disability rating under 38 C.F.R. § 4.124a, Diagnostic Code 8100. The Veteran has continued to report the same sort of headache symptoms, frequency, severity and effects on his activities.

In October 2010, the Veteran submitted a written statement that was interpreted by the RO as a claim for an increased evaluation for the service-connected headaches.

He was seen in the medicine clinic in December 2010; he complained of daily headaches. The Veteran reported that the intensity of the headaches varied and that he had bad headaches twice a day. He also reported lying down in a dark room. The Veteran appellant was afforded a rehabilitation medicine consultation for headaches in January 2011; he reported daily constant headaches and said that he would wake up with headaches. He said that the headaches waxed and waned and that he was not really sure what made them better or worse. In February 2011, the Veteran reported that he was feeling well other than his chronic headaches.
On a VA neurological examination in February 2011, the Veteran reported that his headaches had gotten progressively worse and that they had been especially bad in the last year. He described the headaches as nearly constant, especially when he got up in the morning. He said that they lasted three quarters of an hour to one hour after taking Tylenol. The Veteran denied having had any neurologic-related hospitalization or surgery. The examiner noted that the Veteran's headaches occurred weekly with a usual duration of hours, but stated that the headaches were not prostrating as ordinary activity was possible. When asked to report their effect on his usual occupation and resulting work problems, the Veteran indicated that everything bothered him when he had a real bad headache. Their effect on occupational activities was noted to include decreased concentration, inappropriate behavior, poor social interactions, decreased mobility, problems with lifting and carrying, and pain. The examiner stated that there were no effects on usual daily activities. In terms of employment history, the Veteran reported that he had retired from truck driving in 1984, due to a fractured foot. 

On a VA general medical examination in March 2011, the Veteran complained of headaches that occurred daily (in the morning). He reported that he sometimes took Tylenol every other day for noon and nighttime headaches. The Veteran said that he had headaches with loud noises and that he was unable to play with his grandchildren or do chores such as vacuuming, and that his yardwork was done by a neighbor and his children. He also reported that his driving ability was normal. In terms of occupational history, the Veteran reported working as a farmer for 12 years and then working for a silo company until 1981, when he retired. The examiner indicated that the Veteran's coronary artery disease caused him to experience chest tightness and dyspnea with stacking wood and that his osteoarthritis caused him to be unable to stand or walk any length of time or to work overhead. The examiner concluded that the Veteran was unable to engage in substantial gainful employment.

The Veteran underwent a VA mental health examination in April 2011. He reported that he had been a truck driver for two years and that he would also help out a farmer with driving the tractor, but that he had to quit doing those things because they would trigger the headaches. The Veteran also reported experiencing almost daily headaches that interfered with all activities. He explained that he could not work, do housework, or help out around the house because so many activities aggravated the headaches. 

In a handwritten statement received in April 2011, the Veteran wrote that his headaches had gotten worse and were now "as bad as they can get." 

However, a June 2011 VA nursing note reflects that the Veteran complained of headache pain that was 2/10 in intensity, and reported his head pain was aggravated by noise and bright lights. That same day, the Veteran reported to a neurologist that he had constant frontal headaches. On an August 2011 nursing note, the Veteran reported head pain that was 3/10 in intensity; he said that the pain had been unchanged since his last visit. Later that same day, he told a neurologist that the quality of his headaches varied, but they were usually worse in the mornings and improved after breakfast. He said that he was not interested in trying other medications.

In September 2011, the Veteran sought VA treatment and reported that he had felt chest pain while working in his garage. A September 2011 cardiology note indicated that the Veteran reported that he had been helping his daughter with housework the previous day. He was admitted to the hospital and the associated inpatient treatment notes did not include any mention of complaints about headaches. A March 2012 medicine clinic note indicates that the Veteran reported having a good energy level. He was still not able to do very much due to provocation chest pain such as from lifting a large and bulky but light box 50 feet from his car to his house. Later that same month, the Veteran complained of a cough during the review of systems but denied having headaches. In May 2012, the Veteran reported that his activity had been limited by both shortness of breath and low back pain; there was no mention of headaches. In June 2012, he was noted to have Parkinson's disease with an onset in the fall of 2011; his gait was hunched over and shuffling with reduced arm swing.

On a VA headaches examination in September 2012, the Veteran reported that his headaches were the same as since service, or a little more constant. He described them as being at a level seven out of 10 on most days, sharp at times, and constantly dull. He said the headaches were better when he was in a quiet and dark room. The Veteran denied any other recent treatment other than taking Tylenol. He reported that his headache pain was constant with pulsating or throbbing head pain; pain on both sides of the head; and pain worsened with physical activity. He said the pain worsened with more people around, which could cause the headache to throb. The examiner noted that the Veteran had developed Parkinson's disease as well as having diagnoses of diabetes mellitus, arteriosclerotic heart disease, and hypertension. The Veteran reported that his headaches were worse with noise or in a rough riding vehicle like the VA van, and that he was forced to go to bed two or three times a week to control the pain. He denied experiencing non-headache symptoms (nausea, vomiting, sensitivity to light, sensitivity to sound, changes in vision (such as scotoma, flashes of light, tunnel vision), or sensory changes (such as feeling of pins and needles in extremities). The examiner concluded that the Veteran did not have characteristic prostrating attacks of migraine headache pain and did not have very frequent and prolonged attacks of migraine headache pain. The examiner also concluded that the Veteran had characteristic prostrating attacks of non-migraine headache pain more frequently than once a month and did not have very frequent and prolonged attacks of non-migraine headache pain. The examiner opined that the Veteran's headaches did not impact his ability to work.

The Veteran also underwent a VA mental health examination in September 2012; the examiner reviewed the claims file. The Veteran said that he couldn't think of anything that was causing him distress. Neither he nor his spouse mentioned any problem with headaches. He described their marriage as good and said that he had approximately 20 friends. The appellant further stated that he played cards or went to the casino occasionally for fun. He said that he napped for one-and-a-half hours to two hours per day. The examiner noted that the Veteran had previously been deemed to be unemployable due to his severe headaches but opined that it is unlikely that the Veteran could work again due to his age.

The Veteran's VA medical treatment records reflect that he complained of chronic right lower extremity edema and back pain in November 2012. He stated that he was otherwise feeling well and he made no mention of headaches.

The Veteran underwent another VA headaches examination in January 2013; the examiner reviewed the Veteran's claims file and medical records. The examiner stated that the Veteran's story was inconsistent as he sometimes said his headaches were constant and sometimes he said that they were intermittent. The examiner's judgment was that the Veteran's headaches were intermittent overall with a frequency of three to four times a day. The Veteran reported that the headaches went away 30 minutes after taking Tylenol. He said that his headaches were worse in the morning and with noise and with riding in a van over bumpy terrain. The headaches were described as sometimes achy and sometimes pounding in nature. The location was frontal and vertex. The Veteran reported pain worsening with physical activity, sensitivity to sound, and photosensitivity since the removal of cataracts (the examiner specifically indicated this sensitivity was unrelated to headaches). The duration of typical head pain was noted to be less than one day with 30 minutes duration after acetaminophen. Frequency was three to four times a day. The examiner concluded that the Veteran did not have characteristic prostrating attacks of migraine headache pain, nor did he have very frequent prostrating and prolonged attacks of migraine headache pain, prostrating attacks of non-migraine headache pain, or very frequent prostrating and prolonged attacks of non-migraine headache pain. The examiner opined that the appellant's headaches did not impact his ability to work.

In terms of a normal day, the Veteran reported getting up at 7am, dressing, shaving, and eating breakfast. He then watched television and/or played card games. About once a month he went out to coffee with his brother. He attended church every Sunday. He did not help with housework but went to his grandchildren's sporting events, usually in the summer because he does not like to drive during the winter. He went to baseball and softball games but said he did not like going to volleyball or basketball games because the loud sounds aggravated his headaches. He stated that he was able to drive when he and his wife went to get groceries.

It was the examiner's opinion that - by his own description - the Veteran's headaches were not prostrating. The examiner also opined that, although loud sounds did increase the Veteran's headaches, the headaches did not impair his ability to be gainfully employed in a quiet environment. The examiner noted that the headaches, though frequent (three to four times a day), were alleviated within a short period of time (30 minutes) by acetaminophen alone. The examiner also noted for the record that the Veteran had not sought gainful employment since 1981, when he was laid off after sustaining a left ankle fracture on the job, and that he was of age to get Social Security and had never sought employment in the last 32 years. 

The examiner also included a discussion of the findings noted in the VA examination reports dated in March 2011, April 2011 and September 2012. It was the examiner's opinion, based on a review of the medical records and after conducting a history and physical examination in January 2013, that she agreed with the September 2012 assessment that the Veteran's service-connected headaches did not impact his ability to work. In addition to reiterating many of the points she had previously made, the examiner also noted that the natural course of post-concussive headaches does not include an increase after the period of time such as that following the appellant's 1981 retirement. The examiner also pointed out that the Veteran denied experiencing anxiety, depression, dizziness, vertigo, disequilibrium, visual complaints since cataracts had been removed, a decreased sense of smell and taste, diplopia, blurred vision, dysphagia, dysarthria, weakness, memory problems, or problems concentrating. 

During an April 2013 VA clinic visit, the Veteran reported constant chronic headaches that were increased with noise and movement. He denied having any significant pain on the pain screen. On the Lawton-Brody scale of instrumental activities of daily living, the appellant was described as able to operate a telephone on his own initiative; take care of shopping needs independently; able to prepare food independently; able to maintain house alone or with occasional assistance (heavy domestic help); able to do personal laundry; and able to travel independently on public transportation or drive own car.

As reflected by his attorney's letter of May 2014, the Veteran testified during his March 2014 Board videoconference hearing that he suffered from daily headaches which force him to take medication and lie down in a dark room for 45 to 60 minutes. He said that the drive to the RO for the hearing had caused him to have a headache.

A VA examination was conducted in January 2017. The Veteran reported having headaches every day that were 2-3 out of 10 in severity. The headaches started frontally and went to the occiput in the middle of the head, sometimes more to the right. They lasted for up to 45 minutes and responded to Tylenol. The Veteran reported progressive worsening over the years with change of position, vibration, or thinking hard on a topic. He reported that he had to quit using a riding mower for the last two years. The examiner stated that the Veteran did not have characteristic prostrating attacks of either migraine or non-migraine headache pain, nor did he have very prostrating and prolonged attacks of either migraine or non-migraine headache pain productive of severe economic inadaptability.

After having carefully reviewed the evidence of record, the Board finds that a disability rating in excess of 30 percent is not warranted for the Veteran's service-connected posttraumatic headaches. In this respect, the competent medical evidence does not reflect that the Veteran's headaches result in very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. As previously noted, the Court, in a February 2010 memorandum decision, while noting that the Veteran had argued that he has frequent headaches that were completely prostrating in that he sustained daily headaches, some of which required him to retire to a dark, quiet room until they pass, was unable to conclude that the frequency and severity of the Veteran's headaches presented a picture of extreme exhaustion or powerlessness especially since the record reflected that the Veteran denied associated weakness and stated that, while the Veteran must sometimes retreat to a darkened, quiet, room, he does so not because he is physically incapacitated, but because he desires that the headaches pass. The Court found that there was no evidence in the record that the Veteran's headaches disability rose to the level of completely prostrating and therefore affirmed the Board's September 2008 denial of a 50 percent disability rating under 38 C.F.R. § 4.124a, Diagnostic Code 8100. The Veteran's complaints have not changed much during the appeal period at issue here from those complaints that were delineated in the February 2010 Court decision. 
After careful review of the aforementioned treatment records, as well as the VA medical examinations, the Board concludes that the service-connected disability is adequately reflected by the current 30 percent rating, and it is not of such severity and/or frequency as to warrant the next higher rating of 50 percent under Diagnostic Code 8100. Although the Veteran alleges that he has such severe attacks, objective findings have not shown very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. 

In this regard, the Board finds the February 2011, January 2013, and January 2017 VA examiners' opinions that the appellant's headaches were not very frequent completely prostrating and prolonged to be particularly persuasive, as the three examiners based their opinions on an examination of the appellant and his medical records. As such, the evidence of record more nearly approximates the criteria for a 30 percent rating, and no higher. 38 C.F.R. §§ 4.7, 4.124a, Diagnostic Code 8100. 

The Board notes that the Veteran has testified and submitted written statements that he has had to quit particular jobs because of his posttraumatic headaches. In February 2010, the Court also noted the Veteran's statements that he recently had to cease working for a local farmer, as he had done for 17 years, because the jostling of the farm equipment caused headaches. As reflected in a December 2011 letter from the Veteran's attorney, the Veteran had to stop work as a farmhand in December 2005; the attorney again stated, in November 2013, that the Veteran stopped working in 2005 explicitly because of his headaches. However, review of the evidence of record reveals that the Veteran submitted a claim for nonservice-connected pension benefits on May 29, 1984; in his application the Veteran stated that he had not worked since October 1982, and that he was unable to work due to amputation of his fingers in October 1965, and September 1981 injuries to his neck, back and foot. The Veteran made no mention of any headaches. During a VA medical examination conducted in July 1984, the Veteran again made no mention of any headaches. He was granted nonservice-connected pension benefits in a rating decision issued in August 1984, effective from May 29, 1984. In an April 1989 pension eligibility verification report, the Veteran stated that he had not had any employment between February 1988 and January 1990. In a VA Form 20-5655, Financial Status Report (FSR) dated in November 1989, the Veteran reported that he had not worked during the prior two years. In an FSR submitted in July 1994, the appellant stated that he had not had any employment during the previous two years. He continued to accept nonservice-connected benefits based on his inability to work.

Thus, if the Veteran was engaged in substantial gainful activity as a farmhand that ended in 2005 after 17 years, then that employment had to have started in 1988 - when the Veteran was approximately 57 years old. The record also reflects that he was found eligible for Social Security Administration (SSA) disability benefits based on an inability to work as of December 1, 1984, and that, after an initial denial, he received his initial SSA payment in April 1989. So the question arises - how could the Veteran who was accepting government disability benefits based on an inability to work be engaged in substantial gainful activity as a farmhand? Either he was working while fraudulently accepting disability benefits for not being able to work - raising the specter of an overpayment of pension benefits - or he was not engaged in substantial gainful activity between 1988 and 2005, as he claims he was in this instance. Either way, the Veteran's credibility about his work history and his headaches causing him to be unable to work is severely compromised.

The Board also has considered application of Diagnostic Code 8045 which pertains to brain diseases due to trauma. Under Diagnostic Code 8045, a 10 percent rating is warranted for purely subjective complaints following trauma, such as headache, dizziness, insomnia, etc., recognized as symptomatic of brain trauma. This 10 percent rating will not be combined with any other rating for a disability due to brain trauma. Ratings in excess of 10 percent for brain disease due to trauma under Diagnostic Code 9304 are not assignable in the absence of a diagnosis of multi-infarct dementia associated with brain trauma. Purely neurological disabilities such as hemiplegia, epileptiform seizures, facial nerve paralysis, etc. resulting from brain trauma are rated under the diagnostic codes specifically dealing with such disabilities. 38 C.F.R. § 4.124a. However, in this case, there is no indication that the Veteran has any brain disease due to trauma. Therefore, Diagnostic Code 8045 is not for application in this case.

The Board has compared the level of severity and symptomatology of the Veteran's service-connected posttraumatic headaches with the established criteria found in the rating schedule and finds that his disability picture is not so unusual or exceptional in nature to render the current rating inadequate with respect to his service-connected posttraumatic headaches. The medical evidence outlined above indicates that the Veteran's headaches occur anywhere from one to four times a day, and are predominantly described by him as moderate in severity and frequently as severe. Although the Veteran occasionally has to lie down in a dark room to alleviate his headaches and although he complains that the headaches are triggered by loud noise (to include the noise produced by his grandchildren), vibration, or his being jarred about by farm machinery, he has consistently denied that his headaches are accompanied by nausea, vomiting, anorexia, numbness, visual changes or scotomas, vertigo or syncope. 

The Board acknowledges that the Veteran's service-connected posttraumatic headaches are frequent, and that they even occur daily. The objective evidence of record, however, to include the Veteran's own testimony, fails to show that they are completely prostrating or prolonged. Rather, the Veteran has consistently reported that his headaches affect him more in the morning, that they subside relatively quickly and that he is still able to generally function most days. In addition to the foregoing, several VA examiners have specifically found that the appellant's headaches are not prostrating. See VA examination reports dated in February 2011 (not prostrating as ordinary activity was possible); March 2011; January 2013; and January 2017. Moreover, the February 2011 VA examiner noted there were no effects from the headaches on the Veteran's usual daily activities and the March 2011 VA examiner noted the Veteran was able to perform his activities of daily living.

The Board acknowledges the September 2012 headaches examiner's finding that the Veteran had prostrating attacks of non-migraine headache pain, noted to occur more frequently than once per month, and very frequent prostrating and prolonged attacks of non-migraine headache pain. This opinion is not afforded any probative value as the examiner did not explain how the Veteran's non-migraine type headaches were prostrating. See Prejean v. West, 13 Vet. App. 444, 448-9 (2000) (a factor for assessing the probative value of a medical opinion includes the thoroughness and detail of the opinion). To the extent this assessment was based on the Veteran's report of constant pain at an intensity of 7/10, the Board does not find this report to be credible, since it is in the nature of hyperbole in comparison to his descriptions of pain at a level of 2 or 3/10 when he is reporting for medical treatment and therefore not reliable as a true picture of his headaches. See Cartwright v. Derwinski, 2 Vet. App. 24, 25 (1991) (a pecuniary interest may affect the credibility of a claimant's testimony). The Board may reject a medical opinion if it finds that other facts present in the record contradict the facts provided by the Veteran that formed the basis for the opinion. Kowalski v. Nicholson, 19 Vet. App. 171 (2005); Coburn v. Nicholson, 19 Vet. App. 427 (2006). In addition to the September 2012 VA examiner's finding not being afforded any probative value, the Board notes that the examiner who conducted the February 2011 VA neurological examination specifically noted that the appellant's headaches, though weekly in occurrence with a usual duration of hours, were not prostrating as ordinary activity was possible, and that the January 2013 VA examiner came to the same conclusion, noting that the appellant did not have prostrating attacks of non-migraine headache pain, or very frequent prostrating and prolonged attacks of non-migraine headache pain. The January 2013 VA examiner also concluded that the appellant's story was inconsistent as he sometimes reported his headaches were constant and at other times reported that they were intermittent. 

Again, to warrant a 50 percent rating, the evidence must show that the appellant's headaches are very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. 38 C.F.R. § 4.124a, Diagnostic Code 8100. To fulfill the criteria for a 50 percent rating, the headaches must not only be very frequent, but must also be completely prostrating and prolonged attacks productive of severe economic inadaptability. 

The Board finds that a rating in excess of 30 percent is not warranted because the evidence does not reflect that the Veteran's headaches have been of a completely prostrating nature at any time during the appeal period. The Board acknowledges the lay evidence of record consisting of statements regarding the pain that the appellant has experienced. However, the most probative evidence does not reflect that the Veteran has experienced very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. As shown above, the criteria for a 50 percent rating requires that all elements be met - frequency and completely prostrating and prolonged attacks productive of severe economic inadaptability.

The Veteran insists that his service-connected posttraumatic headaches have caused marked interference with employment. However, there is conflicting evidence in the record regarding the effect that the service-connected posttraumatic headaches have on his ability to work. A June 1983 letter from a private neurologist reports, in pertinent part, that the Veteran was involved in an accident on September 21, 1981, when he fell from a semi-trailer while in the process of tying a steel silo cage on, falling about 10 to 12 feet and fracturing his left ankle. The Veteran was described as having a lot of right occipital headache and some other symptomatology and he had not been back to work, although he had been cleared to go back to work by his orthopedist. It was noted that the company would not accept him and he was involved in a complicated legal situation. 

During a July 1984 VA examination, the Veteran described his occupational history since his discharge from service. He reported driving a truck from 1956 to 1958, being a self-employed farmer from 1958 to 1968, and working for a silo company from 1969 until 1981. Although not specifically noted, there was no indication the Veteran had worked at all between 1981 and July 1984. During a December 2000 VA examination, the Veteran reported basically working as a farmer most of the years since his discharge from service. No specific current employment was noted. Nor was there any specific discussion of current employment noted at the time of the May 2005 VA neurological examination. 

The first time the Veteran reported any current employment after his 1981 injury was during a December 2005 VA visit. More specifically, as detailed in the December 2005 medicine clinic resident note, the Veteran reported having to quit his work operating a tractor as it was inducing headaches so frequently. He repeated this assertion during the June 2006 VA neurological examination when, although denying being employed at that time, he said that the year before he was forced to stop helping a farmer he had been helping for the previous 17 years because he was unable to deal with the bouncing while riding machinery as it caused headaches. The Board notes that if the Veteran had been helping out a famer for 17 years prior to 2005, that employment would have begun in 1988. 

A September 2006 VA internal medicine resident note reveals that the Veteran reported currently working as a semi-driver. After that, however, the Veteran did not report current employment. For example, in a March 2007 statement from the Veteran's then-representative, it was asserted that the Veteran "retired from working some years ago due to another, non-service-related disability (badly broken leg). However, since that time, his headaches have become much more severe, to the point that now the headaches alone would prohibit him from working." The Board notes that there was no specific assertion as to when "some years ago" was.

The Veteran also did not report any current employment during the April 2007 VA general medical examination or during the August 2007 VA neurological examination; instead, he indicated that he was last employed in 1984 as a truck driver. During the April 2007 examination, the appellant he indicated that he was ultimately laid off in 1984 and had tried to get other work, but could not. During the August 2007 VA examination, the Veteran reported that he stopped working as a truck driver as a result of a left foot fracture. The Board notes that the VA examiner used the Veteran's own occupational history and his reason for not working since 1984 in forming an opinion that the Veteran's headaches were not the cause of his inability to continue working as a truck driver. It is also important to note that the Veteran's wife also noted that he had to stop truck driving and working because of frequent headaches. See April 2007 VA Form 21-4138. It is telling that no mention was made of any more-recent employment with a farmer.

The Veteran subsequently did not report any current employment during his February 2011 VA neurological examination but stated that he was last employed in 1984 as a truck driver and that the cause of retirement was medical due to a fractured foot. During the March 2011 VA general medical examination, the Veteran said that he was last employed in 1981, when he retired from the silo company. During the April 2011 VA psychological examination, the Veteran reported driving a truck for two years and helping out a farmer with driving a tractor. He also said that he had to quit doing these things because they would trigger the headaches, but he did not specify when he last worked. During the September 2012 VA psychological examination, the Veteran again said his last year of employment took place in 1981, and during the January 2013 VA headaches examination, he specifically denied seeking employment after sustaining a fracture while working as a truck driver for a silo company since he was old enough to apply for Social Security. (The Board notes that the Veteran was 50 years old at the end of 1981). Also important to note is the fact that when seeking entitlement to a TDIU, the Veteran reported only past employment with the silo company as a truck driver between January 1970 and January 1981. See VA Forms 21-8940 filed in March 2007, and February 2011. 

The Veteran has given varying and wholly inconsistent reports of his employment history since 1981, choosing on some occasions to deny any form of employment beginning alternatively in 1981 and 1984, choosing on other occasions to report working for a substantial amount of time between the mid to late 1980s until the mid-2000s, and choosing on still other occasions to report employment after the inception of his April 2005 claim for an increased evaluation. The Veteran has also given varying and wholly inconsistent reports as to why he ceased employment, alternating between reporting a left foot fracture during the early 1980s as the reason he stopped working and, more recently, to asserting his service-connected headaches as the cause. The Board again points out that if the Veteran had been helping out a farmer for the last 17 years, as reported during the June 2006 VA neurological examination, that employment would have begun in 1988, when he was in receipt of nonservice-connected pension benefits. It is important to note that he did not mention any such employment during VA examinations conducted in December 2000 or May 2005. 

The inconsistency surrounding the Veteran's history of employment and reasons for ceasing employment, irrespective of when that actually happened, have led the Board to determine that the Veteran is not credible. The Board also notes at this juncture that for reasons it cannot ascertain, the Veteran has failed to report the most recent employment he contends he had, namely working for a farmer until sometime in the mid-2000s, when being examined more recently, specifically in February 2011, March 2011, September 2012 and January 2013. 

The Board acknowledges the June 2008 statement from the Veteran's private treating chiropractor, indicating that his headaches disabled him from riding his tractor. To the extent that this statement can be interpreted as support for the Veteran's assertion that he had to stop helping a farmer for whom he had been working sometime in the mid-2000s, it is not afforded any probative value since the Veteran's employment history, to include the alleged recent work with a farmer, has been determined to be incredible. See Kowalski v. Nicholson, 19 Vet. App. 171, 1979 (2005); Coburn v. Nicholson, 19 Vet. App. 427, 432 (2006). 

Since there is no credible or probative medical or lay evidence to support the Veteran's adamant assertion that his service-connected posttraumatic headaches have caused marked interference with employment and, as noted above, no evidence of any period of hospitalization in relation to his service-connected posttraumatic headaches, the factors outlined in the second step of Thun have not been met. Therefore, the third question posed by Thun becomes moot. Nevertheless, the Board will conclude its analysis of the headache disability by addressing the third step in the three-step Thun analysis.

If the factors of step two are found to exist, the third step is to refer the case to the Under Secretary for Benefits or the Director of the Compensation Service for a determination whether, to accord justice, the claimant's disability picture requires the assignment of an extra-schedular rating. See Thun, 22 Vet. App. at 116. This case has twice been referred to the Director of the Compensation Service.

In August 2012, the Director reported that the Veteran was service-connected for posttraumatic headaches evaluated at 30 percent, anxiety associated with posttraumatic headaches evaluated at 30 percent, facial scars evaluated at 10 percent, and history of ulcer disease complicated gastric outlet obstruction associated with posttraumatic headaches evaluated at 10 percent. The examiner also reported that the February 2011 neurological examination showed the Veteran reported his headaches are nearly constant especially in the mornings; that the headaches last about an hour and are relieved by taking Tylenol; that the headaches were not prostrating and ordinary activity was possible; that the headaches were diagnosed as migraines; and that the headaches caused decreased concentration, inappropriate behavior, poor social interaction, decreased mobility, problems with lifting and carrying, and pain. The Director noted that the 30 percent evaluation was continued in an August 2011 rating decision. After laying out the regulatory criteria for an extraschedular evaluation and describing the three-step process outlined in Thun, the Director concluded that there was no evidence that the Veteran's service-connected posttraumatic headaches present an exceptional or unusual disability picture with related factors of marked interference with employment or frequent periods of hospitalization that renders the application of the current rating criteria impractical. Entitlement to an extraschedular evaluation in excess of 30 percent for the service-connected posttraumatic headaches was denied. 

In July 2013, the Director reported that it had determined that the evidence did not support an increased evaluation in excess of 30 percent on an extraschedular basis for the Veteran's posttraumatic headaches. The Director reported that the January 2013 VA examination had revealed that the appellant's report on the severity of his posttraumatic headaches was inconsistent. The VA examiner stated the headaches seem to be intermittent overall, occurring three to four times a day, lasting 30 minutes, and relieved with Tylenol. The headaches were described by the examiner as not prostrating in nature and as not having an impact on the Veteran's ability to work. The examination report contains opinions from two physicians which concluded that the service-connected posttraumatic headaches do not impact the Veteran's ability to work. The headaches were described as occurring three to four times a day and lasting for 30 minutes. The Director noted a February 2013 statement averring that the headaches severely interfere with the Veteran's ability to work. The Director also noted the August 2007 medical opinion stating that the service-connected headaches did not impair the Veteran's ability to perform activities of daily living, and were not the cause of his end of employment. The headaches are not the cause of his inability to work. In January 2013, two physicians opined that the headaches have no impact on the Veteran's ability to work. The Director concluded that the record presented no evidence of an exceptional or unusual disability picture such as marked interference with employment or frequent periods of hospitalization that would render the application of the current rating criteria inadequate. Entitlement to an increased evaluation in excess of 30 percent for the service-connected posttraumatic headaches was denied. 

The Board notes that any deficiency in either the August 2012 or July 2013 decision by the Director of Compensation in regards to what evidence was cited is not prejudicial to the Veteran as the first two steps of the analysis in Thun were not met. The Board agrees with the Director of Compensation that the evidence does not warrant an extraschedular evaluation for the Veteran's service-connected posttraumatic headaches. 

In summary, the Board finds that the degrees of disability specified in the rating criteria for migraine headaches are adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability. 38 C.F.R. § 4.1; VAOPGCPREC 6-96; see also Bagwell v. Brown, 9 Vet. App. 337, 338 (1996); Shipwash v. Brown, 8 Vet. App. 218, 227 (1995). The record is also devoid of evidence of any period of hospitalization in relation to the Veteran's service-connected posttraumatic headaches as well as credible or probative medical or lay evidence that his service-connected posttraumatic headaches have caused marked interference with employment. 

Therefore, the Board finds that there is no evidence showing that the service-connected posttraumatic headaches by themselves cause marked interference with employment, or frequent periods of hospitalization, rendering impractical the application of the regular rating schedule. See 38 C.F.R. § 3.321 (b). 

Lastly, the Director has twice denied entitlement to an extraschedular rating for the Veteran's service-connected posttraumatic headaches on the basis that there was no unusual or exceptional disability pattern that renders application of the regular rating criteria impractical. Based on the foregoing, entitlement to an extraschedular evaluation for posttraumatic headaches is denied as there is clearly no unusual or exceptional disability pattern that renders the application of the regular rating criteria impractical pursuant to 38 C.F.R. § 3.321 (b)(1).
TDIU

The Veteran contends that he is entitled to an earlier effective date for the assignment of a TDIU. The current effective date for the assignment of a TDIU is October 27, 2010. The Veteran contends that the award should go back further. He contends that the effective date for the award of a TDIU should be April 12, 2005, the date he submitted a claim for an increased rating for his service-connected headaches.

The Veteran, through his attorney, contends that he has not been capable of sustaining substantial gainful employment due to his service-connected conditions since as early as 2005. He argues that the effective date for the award of a TDIU should be April 12, 2005, the date he submitted a claim for an increased rating for his service-connected headaches. However, that claim for an evaluation in excess of 30 percent was denied in a Board decision issued in September 2008. In a February 2010 memorandum decision, the Court determined that there was no error in the Board's application of the schedular criteria for evaluating posttraumatic headaches such that affirmance of that portion of the September 2008 Board decision was warranted. 

Furthermore, in August 2012, and again in In July 2013, the Director of Compensation determined that the evidence did not support an increased evaluation in excess of 30 percent on an extraschedular basis for the Veteran's posttraumatic headaches. Thereafter, in an unappealed decision issued in September 2013, the Board denied entitlement to an extraschedular rating for the headaches disability. 
Review of the evidence of record reveals that, in March 2007, the Veteran submitted a claim of entitlement to TDIU. A rating decision dated in August 2007 denied the TDIU claim. The Veteran was notified of the denial in August 2007, but he did not appeal that denial.

In February 2011, the Veteran submitted another claim of entitlement to TDIU. A rating action issued in February 2012, granted the appellant TDIU, with a combined schedular rating of 70 percent, effective October 27, 2010. Service connection for a psychiatric disorder had been granted at 50 percent effective October 27, 2010. That 50 percent evaluation enabled the appellant to meet the schedular requirements for TDIU as of October 27, 2010. 

A TDIU may be assigned where the schedular rating is less than total, when it is found that the disabled person is unable to secure or follow a substantially gainful occupation as a result of a single service-connected disability ratable at 60 percent or more, or as a result of two or more disabilities, provided at least one disability is ratable at 40 percent or more and there is sufficient additional service-connected disability to bring the combined rating to 70 percent or more. See 38 C.F.R. §§ 3.340, 3.341, 4.16(a).

Prior to October 27, 2010, the Veteran was service connected for headaches at 30 percent, facial scars at 10 percent and ulcer disease at 10 percent; his combined rating was 40 percent, effective from April 2005. As noted above, when considering a single service-connected disability, it must be ratable at 60 percent or more. Accordingly, for the entire period from April 12, 2005 to October 26, 2010, the Veteran was service connected for multiple disabilities related to the same in-service incident, but he did not have a disability rating of 60 percent or more. Thus, the schedular criteria for a TDIU under 38 C.F.R. § 4.16(a) were not met prior to October 27, 2010.

The claim associated with a TDIU involves an earlier effective date for an increased rating. Generally, the effective date of an award of increased compensation for service-connected disability shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor. 38 U.S.C.A. § 5110(a); 38 C.F.R. § 3.400(o)(1). There is an exception in that the effective date may the earliest date as of which it is ascertainable that an increase in disability has occurred, provided that the application therefor is received within one year from such date. 38 U.S.C.A. § 5110(b)(2); 38 C.F.R. § 3.400(o)(2).

As above, a specific claim in the form prescribed by the VA must be filed in order for benefits to be paid to any individual under the laws administered by VA. See 38 U.S.C.A. § 5101 (a); 38 C.F.R. § 3.151(a).

Any communication or action, indicating an intent to apply for one or more benefits under the laws administered by VA, from a claimant, his or her duly authorized representative, a Member of Congress, or some person acting as next friend of a claimant who is not sui juris may be considered an informal claim. Such informal claim must identify the benefit sought. Upon receipt of an informal claim, if a formal claim has not been filed, an application form will be forwarded to the claimant for execution. If received within one year from the date it was sent to the claimant, it will be considered filed as of the date of receipt of the informal claim. 38 C.F.R. § 3.155.

Applicable statutory and regulatory provisions require VA look to all communications from the veteran which may be interpreted as applications or claims -- formal and informal -- for benefits. In particular, VA is required to identify and act on informal claims for benefits. 38 C.F.R. §§ 3.1(p), 3.155(a). See Servello v. Derwinski, 3 Vet. App. 196 (1992).

Applicable VA law and regulations state that when the Veteran has a schedular rating which is less than total (for a single disability or combination of disabilities), a total rating may nonetheless be assigned. A TDIU may be assigned when there is a single service-connected disability ratable at 60 percent or more. Disabilities resulting from common etiology or a single accident or disabilities affecting a single body system will be considered as one disability for the above purposes of one 60 percent disability. 38 C.F.R. § 4.16(a). In addition, the disabled person must be unable to secure or follow a substantially gainful occupation. 38 C.F.R. § 4.16(a). Where these percentage requirements are not met, entitlement to the benefits on an extraschedular basis may be considered when the veteran is unable to secure and follow a substantially gainful occupation by reason of service connected disabilities. 38 C.F.R. § 4.16(b).

Any consideration as to whether a veteran is unemployable is a subjective one, that is, one that is based upon the veteran's actual level of industrial impairment, not merely the level of industrial impairment experienced by the average person. Hatlestad v. Derwinski, 1 Vet. App. 164 (1991). Advancing age and nonservice-connected disability are not considered in the determination of whether a veteran is entitled to TDIU. 38 C.F.R. §§ 3.341 (a), 4.19. The sole fact that a claimant is unemployed or has difficulty obtaining employment is not enough. A high rating for service-connected disability, in itself, is recognition that the impairment makes it difficult to obtain and keep employment. The question is whether a veteran is capable of performing the physical and mental acts required by employment, not whether the veteran can find employment. See Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993).

In this case, the Veteran submitted a claim for a TDIU in March 2007. In a rating decision issued in August 2007, the TDIU claim was denied. In October 2007, the Veteran wrote in a letter that he would get headaches just driving the lawnmower or tractor over rough ground and that he could not do that anymore. In April 2008, the Veteran wrote that he had never been told by doctors that he needed to be hospitalized for his headaches. He also wrote that he had to quit driving a tractor or any kind of work. In September 2008, the Board denied his claim of entitlement to an increased rating for the service-connected headaches; the denial of a schedular increase was upheld by the Court in February 2010, and the Board's September 2013 denial of an extraschedular rating was not appealed to the Court.

On October 27, 2010, the RO received a written statement from the Veteran that has been construed as an increased rating claim for the headache disability. VA received the Veteran's formal claim (VA Form 21-8940) for a TDIU on February 15, 2011; he stated that he had stopped working in 1981. 

The Board notes that the Veteran was awarded non-service-connected pension benefits in a rating decision issued in August 1984; the effective date for the award of the pension benefits was May 29, 1984, the date of the application for benefits. The grant was based on residuals from injuries the Veteran incurred in a work-related September 1981 fall from a tractor trailer. The Veteran was subsequently awarded Social Security Administration (SSA) disability benefits with the first payment occurring in April 1989 retroactive to December 1984. In Financial Status Reports submitted by the Veteran in November 1989, and July 1994, he stated that he had not been employed during the previous two years. In a letter dated in November 1989, the Veteran stated that prior to April 1988, he was only getting income from VA. The Veteran continued to receive pension benefits until his VA compensation benefits were the greater benefit.

As previously noted, the Veteran has given varying and wholly inconsistent reports of his employment history since 1981, choosing on some occasions to deny any form of employment beginning alternatively in 1981 and 1984, choosing on other occasions to report working for a substantial amount of time between the mid to late 1980s until the mid-2000s, and choosing on still other occasions to report employment after the inception of his April 2005 increased rating claim. The Veteran has also given varying and wholly inconsistent reports as to why he ceased employment, alternating between reporting a left foot fracture during the early 1980s as the reason he stopped working and, more recently, to asserting his service-connected headaches as the cause. Again, if the Veteran had been helping out a farmer for 17 years, as reported during the June 2006 VA neurological examination, that employment would have begun in 1988; however, the appellant did not mention any such employment during VA examinations conducted in December 2000, and May 2005. He subsequently failed to mention this employment during VA examinations conducted in February 2011, March 2011, September 2012, and January 2013. 

In addition, if the Veteran had been so employed for the claimed 17 years, he was required to report such employment to both VA and the SSA since he was in receipt of non-service-connected pension benefits from VA and disability benefits from SSA for a significant portion of that period. This raises the specter of overpayments and fraud. 

The Veteran reported being unable to work as a truck driver when he was seeking pension benefits in 1984, and thereafter and then he subsequently reported having farm employment involving driving a tractor when seeking a TDIU. If he was able to drive a tractor doing farm work, then the question of whether he was unable to pursue his previous work as a truck driver is raised. There are too many inconsistencies surrounding the Veteran's given history of employment and his given reasons for ceasing employment which point to a conclusion that the appellant is not credible. See Caluza v. Brown, 7 Vet. App. 498, 510-511 (1995) ("Credibility can be genuinely evaluated by a showing of interest, bias, or inconsistent statements, and the demeanor of the witness, official plausibility of the testimony, and the consistency of the witness' testimony"). The Veteran's credibility about his claimed work history, particularly in relation to his claims for monetary benefits, is therefore called into doubt. For these reasons, the Veteran's statements about his claimed work history are deemed not credible.

On February 15, 2011, when the Veteran's VA Form 21-8940 was received by the RO, a combined 40 percent rating was in effect for the Veteran's service connected headaches, evaluated as 30 percent disabling; facial scars, evaluated as 10 percent disabling; and ulcer disease associated with treatment for the service-connected headaches, evaluated as 10 percent disabling. The Board notes that the Court affirmed the Board's September 2008 denial of a schedular evaluation in excess of 30 percent for the service-connected headaches and that no appeal was taken from the Board's September 2013 denial of an extraschedular evaluation for the headaches.

However, service connection was subsequently granted for an anxiety disorder, evaluated as 50 percent disabling effective from October 27, 2010. Such additional disability raised the Veteran's combined rating to 70 percent, effective October 27, 2010. These disabilities resulted from a common etiology or a single accident. Therefore, the combined rating met the criteria for a TDIU under 38 C.F.R. § 4.16(a) (a single service-connected disability ratable at 60 percent or more). In a February 2012 rating action, the RO found that the Veteran had been unemployed since 1981, and that the combination of his service-connected headaches and anxiety made him unable to secure and retain gainful employment. Inasmuch as the Veteran effectively met the criteria for a TDIU on October 27, 2010, the RO assigned that as the effective date of his TDIU. 

However, there is no evidence on file that the Veteran met the criteria for a TDIU prior to October 27, 2010, nor is there any evidence that he was unemployable due to service-connected disability prior to that date. Although the appellant had not worked fulltime since 1981, it must be emphasized that being unemployed or having difficulty finding employment is not the same as being unemployable. Indeed, on his February 2011 application for a TDIU, the Veteran stated that he had not sought employment since he had last worked fulltime in 1981. 

The Board notes that the evidence of record does not contain any competent medical findings to indicate that an increased rating for the headache disability was warranted prior to October 27, 2010. Furthermore, the evidence of record does not contain any communication from the Veteran indicating he wanted to claim service connection for a psychiatric condition secondary to the headache disability prior to October 27, 2010. Therefore, the assignment of an effective date earlier than October 27, 2010, the date the appellant's secondary service connection claim/increased rating claim was received by the RO, for the grant of the total rating based on individual unemployment is not warranted. 

The Board has considered the doctrine of reasonable doubt, but finds that the record does not provide an approximate balance of negative and positive evidence on the merits. The Board is unable to identify a reasonable basis for granting an effective date earlier than October 27, 2010, for the grant of TDIU. The governing statutory and regulatory provisions preclude the assignment of any earlier effective date; there is no doubt to be resolved; and no earlier effective date for TDIU is warranted.












 (CONTINUED ON NEXT PAGE)



ORDER

An initial rating for service connected major depressive disorder and generalized anxiety disorder in excess of 50 percent prior to January 24, 2017, and in excess of 70 percent from January 24, 2017, is denied.

A rating in excess of 30 percent for service-connected headaches is denied.

An effective date prior to October 27, 2010 for TDIU is denied.



______________________________________________
KATHLEEN K. GALLAGHER
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs